Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UDIT VORA, derivatively on behalf of SABLE OFFSHORE CORP., <br><br> Plaintiff, <br><br> v. <br><br> JAMES C. FLORES, GREGORY D. PATRINELY, MICHAEL DILLARD, GREGORY PIPKIN, and CHRISTOPHER SAROFIM, <br><br> Defendants, <br><br> and <br><br> SABLE OFFSHORE CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

## INTRODUCTION

Plaintiff Udit Vora ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Sable Offshore Corp. ("Sable" or the "Company"),

---

Verified Shareholder Derivative Complaint

files this Verified Shareholder Derivative Complaint against defendants James C. Flores ("Flores"), Gregory D. Patrinely ("Patrinely"), Michael Dillard ("Dillard"), Gregory Pipkin ("Pipkin"), and Christopher Sarofim ("Sarofim") (collectively, the "Individual Defendants," and together with Sable, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Sable, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Flores and Patrinely for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Sable, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from May 19, 2025 to November 4, 2025, inclusive (the "Relevant Period").

2.     Sable is a Texas-based oil production company focused on developing oil contained in the Santa Ynez Unit in federal waters offshore California. The Company acquired its assets in the Santa Ynez Unit through a purchase and sale agreement (the "Purchase Agreement") with Exxon Mobil Corporation ("Exxon") and Mobile Pacific Pipeline Company ("Mobile Pacific"). According to Purchase Agreement, Sable agreed to acquire assets comprising the Santa Ynez oil field in Federal waters off the coast of

California in addition to the associated onshore pipeline and processing assets (collectively, the "SYU Assets").

3. The SYU Assets comprise three platforms in the federal waters off the coast of California, in addition to its associated onshore pipeline and processing assets. The offshore portion of the SYU assets consists of 16 federal leases covering roughly 76,000 acres. The three platforms service 112 wells, consisting of 90 producers and 12 injectors. Moreover, the SYU Assets consist of 10 idle opportunities and 102 identified but undrilled opportunities.

4. The SYU Assets have had a long and troubled history dating back to 2015. For example, on May 19, 2015, a pipeline located in Santa Barbara County and part of the SYU Assets ruptured, causing 120,000 gallons of crude oil to spill over. As a result, over 20,000 gallons of crude oil spilled into the Pacific Ocean, killing hundreds of marine wildlife and creating an offshore oil slick covering more than nine square miles. After Exxon failed in its attempt to restart oil production of the SYU Assets, Exxon agreed to enter into the Purchase Agreement with Sable. Before Sable was allowed to resume oil production in the SYU Assets, they were first required to remedy all the remaining issues with the burst pipeline.

5. Leading up to and throughout the Relevant Period, the Individual Defendants either made or caused the Company to engage in various forms of conduct that violated environmental regulations and, *inter alia*, resulted in the enjoining of future efforts to resume production of the SYU Assets. As such, the Company has been and is currently subject to numerous actions from government authorities regarding Sable's continued construction of the SYU Assets in violation of various environmental regulations.

6. For example, in September 2024, the California Coastal Commission ("CCC") issued a Notice of Violation to Sable, alleging Sable was violating the California Coastal Act and Santa Barbara County's Local Coastal Program as Sable was engaging in construction activities without a permit.

7.    After further Notice of Violations, cease and desist orders, and a pair of cross complaints against the CCC and Sable, the court ruled in favor of CCC, holding that the CCC had the authority to issue Sable cease and desists.

8.    Additionally, on September 19, 2025, the Company was charged with sixteen misdemeanors for violations of the California Fish and Game Code and five felony violations of the California Water Code by the Santa Barbara District Attorney for allegedly discharging dredged or fill material into creeks and wetlands that are considered "waters of the United States."

9.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Sable, willfully or recklessly made and/or caused the Company to engage in various forms of conduct that violated environmental regulations and, *inter alia*, resulted in the enjoining of future efforts to resume production of the SYU Assets. Specifically, the Individual Defendants willfully or recklessly caused the Company to, *inter alia*: (1) conduct construction activity without obtaining the necessary permits and authorization; (2) fail to complete the necessary repairs to damaged pipelines in the SYU Assets; (3) the Company's failure to obtain the necessary permits and authorization and its failure to repair the damaged pipelines resulted in the Company being enjoined from resuming production by the SYU Assets; (4) the Company discharged dredged and/or fill material into prohibited creeks and wetlands resulting in a felony complaint consisting of five violations; and (5) the Company failed to notify the California Regional Water Quality Control Board ("CRWQCB") of its proposed waste charges and satisfy appropriate regulations resulting in a civil complaint (collectively, the "Oil Production Misconduct").

10.    Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, pertaining to the Company's compliance with regulatory bodies and the timeframe in which Sable would resume oil production in the SYU Assets.

11.    For example, on May 19, 2025, the Company issued a press release titled

Verified Shareholder Derivative Complaint

"Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in June 2025" (the "May 2025 Press Release"). The May 2025 Press Release highlighted the Company's repair of the SYU Assets and the subsequent oil production, stating, in relevant part "as of May 15, 2025, [Sable] has restarted production at the Santa Ynez Unit ("SYU") and has begun flowing oil production to Las Flores Canyon ("LFC") and that "Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by the Consent Decree."

12.    The May 2025 Press Release quoted Defendant Flores as touting the Company's cooperation with regulatory bodies, stating that "[Sable Offshore] is proud to have safely and responsibly achieved first production at the Santa Ynez Unit" and is "very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California."

13.    The truth began to emerge on May 28, 2025, when a letter dated May 23, 2025, which was written by Eleni Kounalakis, the Lieutenant Governor of California and the chair of the California State Lands Commission (the "May 2025 Letter") to Sable's Vice President of Environmental & Government Affairs, Steve Rusch ("Rusch") was published to the public. The May 2025 Letter revealed that the May 2025 Press Release mischaracterized the Company's compliance with environmental regulations and the timeframe in which the Company resumed oil production of the SYU Assets. Specifically, the May 2025 Letter stated:

I am writing to express my serious concerns regarding Sable Offshore Corp.'s [May 2025 Press Release], which you sent to Commission staff on the same day. *The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions.*

*Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures*

*required by the Bureau of Safety and Environmental Enforcement prior to restart*. These activities *do not constitute a resumption of commercial production* or a full restart of the SYU. Characterizing testing activities as a restart of operations is *not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU.*

I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity. *Sable's failure to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities*, and raises serious questions about Sable's willingness to be a transparent operator.

Commission staff's letter dated May 9, 2025*, made clear that failure to comply with applicable regulatory requirements or to resolve any outstanding regulatory issues could constitute a breach of the Commission's leases*. Any attempt to restart commercial operations at the SYU without final regulatory approvals *may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease*.

As Chair of the State Lands Commission, it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. *The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable.[1]*

14.     On this news, the price per share of the Company's common stock fell $5.04, or roughly 15.3%, from a price per share of $32.93 at the close of trading on May 27, 2025 to close at $27.89 per share on May 28, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

---

[1] All emphasis herein is added unless stated otherwise.

15.    The truth continued to emerge on October 31, 2025, when the publication Hunterbrook Media ("Hunterbrook") published a report titled "Exclusive: Exxon Spinout Sable Leaked Key Info To Investors Including Golfer Phil Michelson" (the "Hunterbrook Report"). The Hunterbrook Report revealed that Defendant Flores had "told a select group of investors in October that the company would likely have to raise up to $200 million in equity by the end of 2025." Further, the Hunterbrook Report contained an audio recording of Defendant Flores discussing the timeline for oil production in the SYU Assets. Specifically, Defendant Flores stated on the audio recording, "We're supposed to be on production in September, right? We're not gonna be on production in September, so we're gonna have to bridge a little to the financing. …"

16.    On this news, the price per share of the Company's common stock fell $2.37, or roughly 18.5%, from a price per share of $12.83 at the close of trading on October 30, 2025 to close at $10.46 per share on October 31, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

17.    The truth fully emerged on November 3, 2025, when the Company issued a press release titled "Sable Offshore Corp. Provides Strategic Update to Investors" (the "November 2025 Press Release"). The November 2025 Press Release revealed that Sable and Exxon entered into an amended loan agreement that would become effective once Sable raises at least $225 million in equity contributions. The November 2025 Press Release further revealed that the Company had formed a special committee to investigate the allegations contained in the Hunterbrook Report.

18.    The next day, the Santa Barbara County Board of Supervisors (the "Santa Barbara Board") voted 4-1 to deny the transfer of ExxonMobil permits to Sable. Notably, Supervisor Steve Lavagnino ("Lavagnino"), who previously voted in favor of Sable but reversed his support, stated "Trying to simply bulldoze through the permitting process has

7

not been [a] help, and is not how we expect businesses in Santa Barbara County to conduct themselves."

19.    On this news, the price per share of the Company's common stock fell $3.19, or roughly 30.5%, from a price per share of $10.46 at the close of trading on October 31, 2025 to close at $7.27 on November 3, 2025. As the market continued to adjust to the Company's revelations, the price per share of the Company's common stock fell a further $1.37, or roughly 18.8%, from a price per share of $7.27 at the close of trading on November 3, 2025 to close at $5.90 on November 4, 2025.

20.    During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Sable, willfully or recklessly made and/or caused the Company to make false and misleading statements. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

21.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

22.    The Individual Defendants failed to correct and/or caused the Company to fail

Verified Shareholder Derivative Complaint

to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

23.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

24.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO") and its Chief Financial Officer ("CFO") to a federal securities fraud class action pending in the United States District Court for the Central District of California (the "Securities Class Action"), which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

25.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

26.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and Defendants Flores and Patrinely's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other Individual defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act

(15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

28.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

29.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

30.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

31.    Plaintiff is a current shareholder of Sable. Plaintiff has continuously held Sable's common stock since first purchasing shares on November 15, 2024.

### Nominal Defendant Sable

32.    Sable is a Delaware corporation with principal executive offices at 845 Texas Avenue, Suite 2920 Houston, Texas 77002. Sable's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SOC."

### Defendant Flores

33.    Defendant Flores has served as the Company's CEO and as Chairman of the Board since February 2024.

34.    According to the Company's Schedule 14A filed with the SEC on April 17, 2025 (the "2025 Proxy Statement"), Defendant Flores received a total compensation of $1,707,013, comprised $1,121,540 in salary and $585,473 in all other compensation, for the year ended December 31, 2024.

35.    The 2025 Proxy Statement stated the following about Defendant Flores:

***James C. Flores***, 65, has been our Chairman and Chief Executive officer since February 2024. Prior to that, Mr. Flores served as Flame's co-founder, Chief Executive officer and Chairman of its board of directors from its inception to February 2024. From its inception to March 3, 2023, he also served as Flame's President. From May 2017 until February 2021, Mr. Flores served as President, Chief Executive Officer and Chairman of Sable Permian Resources, which engaged in the acquisition, consolidation and optimization of oil and gas upstream opportunities. Sable Permian Resources filed a voluntary petition for bankruptcy on June 25, 2020 and emerged from bankruptcy on February 1, 2021. Prior to Sable Permian Resources, Mr. Flores served as Vice Chairman of Freeport-McMoRan, Inc. and CEO of Freeport-McMoRan Oil & Gas, a wholly owned subsidiary of Freeport-McMoRan Inc., the world's largest publicly traded copper producer, from June 2013 until April 2016. From 2001 until 2013, Mr. Flores was the Chairman, CEO and President of Plains Exploration & Production Company and Chairman and CEO of Plains Resources Inc. From 1994 until 2000, Mr. Flores was also the Chairman and CEO of Flores & Rucks, Inc. which, after several acquisitions, was later renamed Ocean Energy Inc. prior to its sale to Devon Energy Corporation. Since 1982, Mr. Flores has had an extensive career in the oil and gas industry in the roles of Chairman, Chief Executive Officer, and President of four public and one private oil & gas exploration and production companies. He is a member of the National Petroleum Council, serves as Trustee for the Baylor College of Medicine and is a Director for the Waterfowl Research Foundation. He was recognized as Executive of the Year in 2004 in Oil and Gas Investor magazine. Mr. Flores received a B.S. degree in corporate finance and petroleum land management from Louisiana State University. We believe Mr. Flores is qualified to serve on our board of directors due to his more than 40 years in the oil and gas industry, including as Chief Executive Officer of several public companies. Mr. Flores is the father of J. Caldwell Flores, who is the President of Sable.

**Defendant Patrinely**

36.    Defendant Patrinely has served as the Company's Executive Vice President and CFO since February 2024.

37.    According to the 2025 Proxy Statement, Defendant Patrinely received $9,302,615 in total compensation, comprised of $664,615 in salary, $750,000 in bonus pay, $7,865,000 in stock awards, and $23,000 in all other compensation, for the year ended December 31, 2024.

38.    The 2025 Proxy Statement stated the following about Defendant Patrinely:

**Gregory D. Patrinely**, 39, has been our Executive Vice President and Chief Financial Officer since February 2024. Prior to that, Mr. Patrinely served as Flame's Chief Financial Officer from its inception to February 2024. Since March 3, 2023, he has also served as Flame's Executive Vice President. From its inception to March 3, 2023, he also served as Flame's Secretary. From June 2018 until February 2021, Mr. Patrinely served as Executive Vice President and Chief Financial Officer of Sable Permian Resources, which engaged in the acquisition, consolidation and optimization of oil and gas upstream opportunities. Sable Permian Resources filed a voluntary petition for bankruptcy on June 25, 2020 and emerged from bankruptcy on February 1, 2021.

Mr. Patrinely previously served as Treasurer for Sable Permian Resources, from May 2017 to June 2018, where he oversaw the financial analysis and execution of refinancing, restructuring and acquisition efforts. Prior to Sable Permian Resources, Mr. Patrinely was a Manager in the Acquisitions & Divestments Group of Freeport-McMoRan Oil & Gas, a wholly owned subsidiary of Freeport-McMoRan Inc., from May 2013 to April 2017, following the company's merger with Plains Exploration and Production Company ("PXP"). Mr. Patrinely served in the same capacity with PXP from October 2010 to May 2013. During his tenure at FMOG and PXP, Mr. Patrinely managed the execution of financings, mergers, acquisitions and divestments. Prior to his service with PXP, Mr. Patrinely worked in the Energy Investment Banking group at Madison Williams from July 2008 to August 2010. Mr. Patrinely holds a B.S. degree in Economics with Financial Applications and a B.A. degree in English, with Honors, from Southern Methodist University.

### Defendant Dillard

39.    Defendant Dillard has served as a Company director since February 2024. Defendant Dillard also currently serves as a member of the Audit Committee, as Chair of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee.

40.    According to the 2025 Proxy Statement, Defendant Dillard received $578,447 in total compensation, comprised entirely of stock awards, for the year ended December 31, 2024.

41.    The 2025 Proxy Statement stated the following about Defendant Dillard:

***Michael Dillard***, 66, has served on our board of directors since February 2024. Prior to that, he served as a director of Flame from March 2021 to February 2024. He was a partner with the law firm of Latham & Watkins LLP from January 2010 until January 2021. He was a founding partner of the Houston, Texas office of Latham & Watkins LLP, serving as the Houston Office Managing Partner from January 2010 through March 2015. Mr. Dillard was Global Practice Group Chair of Mergers and Acquisitions for Latham & Watkins LLP from March 2018 until January 2021. Mr. Dillard has been involved in M&A transactions valued in excess of $250 billion. Mr. Dillard received a B.A. degree in Mathematics from Southern Methodist University in 1979 (summa cum laude) and a Juris Doctor degree from Southern Methodist University Dedman School of Law in 1982 (cum laude). We believe Mr. Dillard is qualified to serve on our board of directors due to his extensive experience in mergers and acquisitions, financing transactions and corporate governance and related matters.

**Defendant Pipkin**

42.    Defendant Pipkin has served as a Company director since February 2024. Defendant Pipkin also currently serves as a member of the Audit Committee, as the Chair of the Compensation Committee, and as a member of the Nominating and Corporate Governance Committee.

43.    According to the 2025 Proxy Statement, Defendant Pipkin received $578,447 in total compensation, comprised entirely of stock awards, for the year ended December 31, 2024.

44.    The 2025 Proxy Statement stated the following about Defendant Pipkin:

***Gregory Pipkin***, 65, has been a director of Sable since February 2024. Prior to that, he served as a director of Flame Acquisition Corp. ("Flame") from March 2021 to February 2024. Since November 2016, he has been a Senior Managing Director with the investment and advisory firm of NRI Energy Partners. Prior to NRI Energy Partners, Mr. Pipkin served as the co-head and Managing Director of the Houston office of the Barclays Natural Resources Group for Barclays PLC, from September 2008 to November 2016. Mr. Pipkin was a board member of Family Legacy Missions International, a mission in Lusaka, Zambia that educates and feeds impoverished and orphaned children. Mr. Pipkin also serves on the board of Morningstar

Partners LP, an oil and gas producer primarily in the central basin platform in the Permian basin, Texas. Mr. Pipkin received a B.S. degree in chemical engineering and an M.B.A. degree in Business Administration from the University of Texas at Austin. We believe Mr. Pipkin is qualified to serve on our board of directors due to his extensive investment experience in the energy industry.

**Defendant Sarofim**

45.    Defendant Sarofim has served as a Company director since February 2024. Defendant Sarofim also currently serves as the Chair of the Audit Committee, as a member of the Nominating and Corporate Governance Committee, and as a member of the Compensation Committee.

46.    According to the 2025 Proxy Statement, Defendant Sarofim received $578,447 in total compensation, comprised entirely of stock awards, for the year ended December 31, 2024.

47.    The 2025 Proxy Statement stated the following about Defendant Sarofim:

***Christoper Sarofim***, 61, has been a director of Sable since February 2024. Prior to that, he served as a director of Flame from March 2021 to February 2024. Mr. Sarofim is the Chairman and a member of the Board of Directors of Fayez Sarofim & Co., an SEC-registered investment advisory firm based in Houston, Texas. Mr. Sarofim joined the firm in 1988 and has been a member of its board since August 2014. Additionally, he serves on the firm's Executive, Finance and Investment Committees. Mr. Sarofim shares portfolio management responsibilities for numerous separate accounts advised by the firm and is a co-manager of several mutual funds Fayez Sarofim & Co. sub-advises for BNY Mellon. Prior to joining Fayez Sarofim & Co., he was employed with Goldman Sachs & Co. LLC in corporate finance. In addition to his work at Fayez Sarofim & Co., Mr. Sarofim serves on the boards of Kemper Corp. (NYSE: KMPR), Highland Resources Inc. and Wood Partners. Mr. Sarofim is the Chairman and a member of the Board of Trustees of The Sarofim Foundation, a member of the Board of Trustees of The Brown Foundation, Inc., Baylor College of Medicine, and serves on the MD Anderson Cancer Center Board of Visitors. Mr. Sarofim received an A.B. degree in History from Princeton University in 1986. We believe Mr. Sarofim is qualified to serve on our board of directors due to his extensive investment advisory background, board experience, and financial market and securities analysis expertise.

Verified Shareholder Derivative Complaint

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

48.    By reason of their positions as officers, directors, and/or fiduciaries of Sable and because of their ability to control the business and corporate affairs of Sable, the Individual Defendants owed Sable and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Sable in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Sable and its shareholders so as to benefit all shareholders equally.

49.    Each director and officer of the Company owes to Sable and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Sable, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.    To discharge their duties, the officers and directors of Sable were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Sable, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual

Defendants who were also the officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

53.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Sable were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Texas, and the United States, and pursuant to Sable's Code of Business Conduct and Ethics (the "Code of Ethics");

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Sable conducted its operations, and, upon

receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Sable and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Sable's operations would comply with all applicable laws and Sable's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to Sable and its shareholders the duty of loyalty requiring that each favor Sable's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Sable and were at all times acting within the course and scope of such agency.

57.    Because of their advisory, executive, managerial, directorial, and controlling

17

positions with Sable, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

58.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Sable.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

61.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Sable was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

62.    Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Sable and was at all times acting within the course and scope of such agency.

## SABLE'S CODE OF ETHICS

64.    Sable's Code of Ethics states that it applies to "[a]ll directors, officers and employees . . . of the Company and all of its subsidiaries and controlled affiliates." The Code of Ethics states that the Company has adopted the code to encourage:

- Honest and ethical conduct, including fair dealing and the ethical handling of actual or apparent conflicts of interest;

- Full, fair, accurate, timely and understandable disclosures;

- Compliance with applicable laws and governmental rules and regulations;

- Prompt internal reporting of any violations of law or the Code;

- Accountability for adherence to the Code, including fair process by which to determine violations;

- The protection of the Company's legitimate business interests, including its assets and corporate opportunities; and

- Confidentiality of information entrusted to directors, officers and employees by the Company and its customers.

Verified Shareholder Derivative Complaint

65.     In a section titled "Conflicts of Interest," the Code of Ethics states, in relevant part:

A conflict of interest occurs when the private interests of a Covered Party interfere, or appear to interfere, with the interests of the Company as a whole.

For example, a conflict of interest can arise when a Covered Party takes actions or has personal interests that make it difficult to perform his or her Company duties objectively and effectively. A conflict of interest may also arise when a Covered Party, or a member of his or her immediate family, receives improper personal benefits as a result of his or her position at the Company.

***

Each Covered Party has an obligation to conduct the Company's business in an honest and ethical manner, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships. Any situation that involves, or may reasonably be expected to involve, a conflict of interest with the Company, should be disclosed promptly to the Company's Audit Committee of the Board and/or the Company's General Counsel.

66.     In the section titled "Disclosures," the Code of Ethics states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all Covered Parties (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with their duties. Covered Parties are prohibited from knowingly misrepresenting, omitting or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self-regulatory organizations.

67.     In the section titled "Compliance with Laws, Rules, and Regulations," the Code of Ethics states:

The Company is obligated to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Covered Party to adhere to the standards and restrictions imposed by these laws, rules and regulations in the performance of his or her duties for the Company.

Trading on inside information is a violation of federal securities law. Covered Parties in possession of material non-public information about the Company or companies with whom we do business must abstain from trading or advising others to trade in the respective company's securities from the time that they obtain such inside information until adequate public disclosure of the information. Material information is information of such importance that it can be expected to affect the judgment of investors as to whether or not to buy, sell, or hold the securities in question. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal.

The Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer or Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

68.     In the section titled "Reporting, Accountability and Enforcement," the Code of Ethics states, in relevant part:

The Company promotes ethical behavior at all times and encourages Covered Parties to talk to supervisors, managers and other appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof, when in doubt about the best course of action in a particular situation.

Covered Parties should promptly report suspected violations of laws, rules, regulations or the Code or any other unethical behavior by any director, officer, employee or anyone purporting to be acting on the Company's behalf to appropriate personnel, including officers, the General Counsel, outside counsel for the Company and the Board or the relevant committee thereof. Reports may be made anonymously. If requested, confidentiality will be maintained, subject to applicable law, regulations and legal proceedings.

The Audit Committee of the Board or other appropriate officer or body shall investigate and determine, or shall designate appropriate persons to investigate and determine, the legitimacy of such reports. The Audit Committee or other appropriate officer or body will then determine the appropriate disciplinary action. Such disciplinary action includes, but is not limited to, reprimand, termination with cause, and possible civil and criminal prosecution.

To encourage employees to report any and all violations, the Company will not tolerate retaliation for reports made in good faith. Retaliation or retribution against any Covered Party for a report made in good faith of any suspected violation of laws, rules, regulations or this Code is cause for appropriate disciplinary action.

69.     In the section titled "Confidentiality," the Code of Ethics states:

In carrying out the Company's business, Covered Parties may learn confidential or proprietary information about the Company, its customers, distributors, suppliers, or joint venture partners. Confidential or proprietary information includes all non-public information relating to the Company, or other companies, that would be harmful to the relevant company or useful or helpful to competitors if disclosed. Covered Parties must maintain the confidentiality of all information entrusted to them, except when disclosure is authorized or legally mandated.

70.     In the section titled "Protection and Proper Use of Company Assets," the Code of Ethics states:

All Covered Parties should protect the Company's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on the Company's profitability. All Company assets should be used for legitimate business purposes.

71.     In the section titled "Waivers," the Code of Ethics states:

Before an employee, or an immediate family member of any such employee, engages in any activity that would be otherwise prohibited by the Code, he or she is strongly encouraged to obtain a written waiver from the Board.

Before a director or executive officer, or an immediate family member of a director or executive officer, engages in any activity that would be otherwise

22

prohibited by the Code, he or she must obtain a written waiver from the disinterested directors of the Board or a committee of the Board. Such waiver must then be disclosed to the Company's shareholders, along with the reasons for granting the waiver.

72.     In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' schemes to engage in the Oil Production Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Sable's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.

## SABLE'S AUDIT COMMITTEE CHARTER

73.     The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee in relevant part, as:

> The purpose of the Audit Committee (the "Committee") is to assist the Board of Directors (the "Board") of Sable Offshore Corp. (the "Company") in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's internal audit function and independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

74.     In a section titled "Duties and Responsibilities," under the subheading "Annual Financial Statements and Annual Audit," the Audit Committee Charter states:

> 3. Audit Problems. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

75.    In the same section, under the subheading "Quarterly Financial Statements," the Audit Committee Charter states:

6. Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

76.    In the same section, under the subheading "Other Duties and Responsibilities," the Audit Committee Charter states, in relevant part:

7. Review of Earnings Releases. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. Risk Assessment and Risk Management. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

***

10. Complaint Procedures. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

11. Reports to the Board of Directors. The Committee must report regularly to the Board regarding the activities of the Committee.

\*\*\*

15. Review of Code of Business Conduct and Ethics. The Committee must, at least annually, consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics and the procedures in place to enforce the Code of Business Conduct and Ethics. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code of Ethics brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board.

16. Review of Whistleblower Policy. The Committee must review and discuss any reports brought to its attention pursuant to the Company's Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud or Auditing Matters and must, at least annually, review and reassess such Policies and Procedures and submit any recommended changes to the Board for its consideration.

77.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Company Background

78.    Sable was originally known as a Flame Acquisition Corp. ("Flame") and operated as a blank check Delaware corporation. On March 1, 2021, Flame effectuated an

initial public offering and its stock began trading on the NYSE.

79.    On November 2, 2022, Flame entered into an Agreement and Plan of Merger with Sable Offshore Holdings LLC and Sable Offshore Corp. ("Legacy Sable").

80.    Prior to the completion of the merger, Legacy Sable entered into the Purchase Agreement with Exxon and Mobile Pacific for the SYU Assets.

81.    On February 14, 2024, the merger between Flame and Legacy Sable was completed and the Company was renamed to Sable Offshore Corp. On the same day, the Purchase Agreement with Exxon and Mobile Pacific closed.

82.    The SYU Assets comprise three platforms in the federal waters off the coast of California, in addition to its associated onshore pipeline and processing assets. The offshore portion of the SYU assets consists of 16 federal leases covering roughly 76,000 acres. The three platforms service 112 wells, consisting of 90 producers and 12 injectors. Moreover, the SYU Assets consist of 10 idle opportunities and 102 identified but undrilled opportunities.

**Background on the SYU Assets**

83.    The SYU Assets have had a long and troubled history. For example, on May 19, 2015, a pipeline located in Santa Barbara County and part of the SYU Assets, ruptured causing 120,000 gallons of crude oil to spill over. As a result, over 20,000 gallons of crude oil spilled into the Pacific Ocean, killing hundreds of marine wildlife and creating an offshore oil slick covering more than nine square miles. As a result, Exxon halted its operations on three offshore oil platforms as the ruptured pipeline was used to transport oil from the offshore platforms to its inland refineries.

84.    In 2018, a Santa Barbara County jury found the former operator of the ruptured pipeline, Plains All American Pipeline L.P. ("Plains"), guilty of a felony and eight misdemeanors resulting from Plains' failure to properly maintain the pipeline.

85.    In 2020, Plains entered into a consent decree with the U.S. Department of Justice, Environmental and Natural Resources Division, the U.S. Department of

Transportation, Pipeline and Hazardous Materials Safety Administration, the EPA, CDFW, the California Department of Parks and Recreation, the California State Lands Commission, the California Department of Forestry and Fire Protection's Office of the State Fire Marshal, Central Coast Regional Water Quality Control Board, and Regents of the University of California (the "Consent Decree").

86.    After the Santa Barbara Board refused to grant permits allowing Exxon to transport the oil by truck, Exxon looked into selling its stake of the SYU Assets. Legacy Sable and Exxon entered into the Purchase Agreement in November 2022 for $643 million.

87.    As part of the Purchase Agreement, Exxon agreed to grant a $623 million loan to Sable, which required Sable to pay interest on January 1 of each year. Additionally, according to the terms of the Purchase Agreement, Sable was required to restart oil production of the SYU Assets by January 1, 2026, to avoid Exxon retaking ownership of the SYU Assets without compensation to Sable. The Purchase Agreement was amended in December 2024, to allow Sable to restart oil production by March 1, 2026, and to refinance the loan within 240 days of first production.

88.    In order to restart oil production of the SYU Assets, Sable was required to complete applications to the Santa Barbara County Planning Commission seeking the transfer of Final Development Permits ("FDPs") from Exxon to Sable. In March 2024, Sable completed the application for the FDPs, and the transfer of the FDPs from Exxon to Sable was approved in October 2024. But environmental groups appealed the decision to the Santa Barbara Board. In February 2025, the Santa Barbara Board voted on the FDP transfer, resulting in a 2-2 tie. As a majority vote is required to support any action, the transfer was not approved.

89.    On May 8, 2025, Sable filed a lawsuit in this district against Santa Barbara County and the Santa Barbara Board seeking to force the transfer of the FDPs to Sable.

90.    On September 12, 2025, Judge Dolly M. Gee denied in part Sable's motion for summary judgment, holding that a majority of the Board was required to approve the

transfer to of FDPs to Sable.[2] Judge Gee further ordered the Board to hold another vote within 60 days.

### Sable Faces Increasing Regulatory Scrutiny due to the Oil Production Misconduct

91. Leading up to and throughout the Relevant Period, the Company was engaged in the Oil Production Misconduct, which violated environmental regulations which caused the Company to suffer increased regulatory scrutiny.

#### *The California Coastal Commission Violations*

92. For example, in September 2024 the CCC issued a Notice of Violation against the Company for conducting construction activities on the SYU Assets without a permit in violation of the California Coastal Act and the County of Santa Barbara's Local Coastal Program.

93. The CCC issued a second Notice of Violation on February 11, 2025, stemming from Sable's unpermitted construction activity of the SYU Assets. However, Santa Barbara County failed to act on the notices, which prompted Sable to respond stating that its construction activity does not require CCC's authorization.

94. On February 16, 2025, the CCC sent a letter to Sable instructing it to "immediately cease all unpermitted development activities." On February 18, 2025, the Company had not responded to the February 16 letter, which caused the CCC to issue an Executive Director Cease and Desist and a notice of intent to commence cease and desist order, restoration order, and administrative order proceedings.

95. The same day, the Company filed a petition against the CCC for declaratory relief and damages, captioned *Sable Offshore Corp. et al v. California Coastal Commission*, Case No. 25-cv-00974 (Cal. Super. Ct.).

96. On April 10, 2025, the CCC issued another cease and desist order and

---

[2] *See Sable Offshore Corp. v. Cnty. of Santa Barbara,* No. CV 25-4165-DMG (AGRx), 2025 WL 2674260, at *1 (C.D. Cal. Sept. 12, 2025).

Verified Shareholder Derivative Complaint

restoration order, in addition to an $18 million administrative penalty against the Company. The cease and desist order required Sable to provide the CCC with complete coastal development permit applications within 30 days for all unpermitted development conducted onshore and offshore and any proposed development activities that have not yet been completed but that are contemplated in the Company's current plans.

97.    On April 16, 2025, the CCC filed a cross-complaint against the Company on seeking equitable and declaratory relief.

98.    On May 28, 2025, Judge Thomas Anderle granted a preliminary injunction enforcing the April 10, 2025 cease and desist order in favor of the CCC. Judge Anderle found that the CCC presented evidence of "of grading and removal of materials, reconstruction of a 'structure,' and change in the intensity of the use of land with respect to Sable's repair and maintenance activities[.]" Judge Anderle further found that "that Sable has not obtained a CDP for Sable's repair and maintenance activities[,] "it issued a [cease and desist order] prohibiting further work with respect to Sable's repair and maintenance activities[,]" and "that Sable has continued its repair and maintenance activities notwithstanding the CDO." Judge Anderle also found in favor of CCC for the balance of harms that the preliminary injunction would impose on Sable.

99.    On October 15, 2025, Judge Anderle ruled in favor of the CCC, finding both that the Company's construction activity was not authorized and that the CCC had not abused its discretion.

### Center for Biological Diversity Actions

100.    The Consent Degree also required Sable obtain approval from the California Office of State Fire Marshal ("OSFM") in order to begin oil production of the SYU Assets. Specifically, the Consent Decree required the OSFM review the startup plan for each pipeline and perform on-site inspections of the pipelines to verify compliance with startup plans, ensure Sable is fulfilling all other necessary requirements, and finalize Sable's startup plans to ensure compliance with the Consent Decree.

101.    Sable was granted an extension on August 1, 2024 to complete its startup plans by July 1, 2025. In granting the extension, OSFM stated that "[i]t is imperative that [Sable] successfully completes the proposed retrofit construction by this new deadline."

102.    On December 17, 2024, it was announced that the Company had received a waiver from OSFM that would exempt the SYU Assets from certain corrosion safety requirements.

103.    On March 13, 2025, Daniel Berlant, the California State Fire Marshal, emphasized the importance for Sable to complete its permits and resolve any other issues before the California State Fire Marshal's office would approve of the production of oil of the SYU Assets. Specifically, he stated "They need to agree that all rules have been followed," he said, according to the Santa Barbara Independent. OSFM's website also states that "Sable must also secure all necessary approvals from all other state and federal agencies before putting the pipeline into operation."

104.    In April 2025, the Center for Biological Diversity filed an action against the California Department of Foresty and Fire Protection in Santa Barbara, captioned *Center for Biological Diversity et al v. California Dept. of Forestry and Fire Protection et al*, Case Nos. 25-cv-02244 and 25-cv-02247 (Cal. Super. Ct.) (the "Center for Biological Diversity Actions"). The Center for Biological Diversity Actions alleged that alleged that the OSFM failed to provide an environmental review of the Company's work on damaged pipelines in the SYU Assets.

105.    On June 3, 2025, Judge Donna Geck issued a temporary restraining order ("TRO") on Sable, which restricted the Company from resuming the use of the SYU Asset pipelines and restricted the OSFM from authorizing the Company to do so.

106.    On July 18, 2025, Judge Geck issued a preliminary injunction "enjoin[ing] the restart of the Las Flores Pipelines . . . until 10 court days following Sable's filing and service of notice that Sable has received all necessary approvals and permits for restarting

the Las Flores Pipelines and that Sable intends to commence such restart."[3]

107.   According to a letter sent by the OSFM to the Company on October 22, 2025, the Company had yet to complete the necessary repairs to the damaged pipeline in the SYU Assets. The letter further asserts that OSM identified requirements of "the State Waivers that has not yet been met and that Sable must complete prior to any potential restart. . . . The above findings alone and the inconsistencies with the State Waiver requirements prevent restart under the law."

### Santa Barbara District Attorney Action

108.   On September 16, 2025, the Company was charged by the Santa Barbara County District Attorney's office with sixteen misdemeanor violations of the California Fish and Game Code and five felony violations of the California Water Code, captioned *People of the State of California v. Sable Offshore Corp.*, Case No. 25-cr-07677 (Cal. Super. Ct.). According to the felony complaint, the Company is alleged to have discharged dredged or fill material into prohibited creeks and wetlands between October 2024 and April 2025.

### California Regional Water Quality Control Actions

109.   On October 3, 2025, the CRWQCB filed a civil complaint against the Company, captioned *People of the State of California ex rel. California Regional Water Quality Control Board, Central Coast Region v. Sable Offshore Corp.*, Case No. 25-cv-06285 (Cal. Super. Ct.) (the "CRWQCB Complaint"). The CRWQCB Complaint alleges the Company of multiple failures to notify the CRWQCB of proposed waste discharges and to satisfy necessary regulations.

110.   Specifically, the CRWQCB Complaint detailed Sable had repeatedly violated environmental regulations and refused to cooperate with regulators. For example, the CRWCB Complaint revealed that in November 2024 the CRWCQB had informed the

---

[3] *Center for Biological Diversity et al v. California Dept. of Forestry and Fire Protection et al*, Nos. 25-cv-02244 and 25-cv-02247, ¶ 1 (Cal. Super. Ct. Jul. 18, 2025).

Company that it lacked the required permits for the Company's pipeline maintenance in the SYU Assets. Sable did not respond to the inquiry, and in December 2024, the CRWQCB issued a Notice of Violation for Unauthorized Discharge of Waste and a directive requiring Sable to identify the specific site where the Company was conducting its unpermitted pipeline repairs.

111.   In January 2025, after Sable still had not responded to the CRWQCB notices, the CRWQCB issued another order requiring the Company to submit a "detailed assessment" of the Company's excavation work in the SYU Assets detailing how the work would impact state and federal waters.

112.   In March and April of 2025, Sable responded to the January 2025 order. The CRWQCB described Sable's responses as providing "incomplete information with little meaningful detail regarding the extensive excavation, repair and backfilling conducted as part of the Repair Plan" and determined that such responses "made clear it did not perform meaningful assessment of the environmental impact of its excavation campaign."

113.   The CRWQCB Complaint further alleged that Sable was attempting to mislead regulators and avoid the permitting process, stating:

> At the time of its inadequate submissions in March and April of 2025, Sable management knew full well additional excavation and repair work would be ongoing. However, instead of identifying sites where Sable was planning to carry out activities resulting in earthen waste discharges that could affect water quality as required by the Section 13267 Order, Sable chose to limit its response to work done as of the March 10, 2025 due date of the Technical Report (which ironically was not met). This cynical approach to the Regional Water Board's regulatory permitting requirements was obviously taken to avoid any potential delay in getting the sites permitted and any associated Regional Water Board review that might impact the July 1, 2025 deadline for Sable's completion of repairs imposed by the Fire Marshal.

114.   On July 24, 2025, the CRWQCB issued a Notice of Violation for Failure to Report against Sable, stating that the CRWQCB had "identified twenty-seven sites where

Sable's excavation and repair activities could affect water quality not previously addressed." On August 13, 2025, the Company responded to the notice, admitting there were "nine sites requiring waste discharge requirements that it had previously either overlooked or made incorrect determinations regarding the impact of the excavations on water quality."

**False and Misleading Statements**

***May 19, 2025 Press Release***

115.    The Relevant Period began on May 19, 2025, when the Company issued May 2025 Press Release, titled "Sable Offshore Corp. Reports Restart of Oil Production at the Santa Ynez Unit and Anticipated Oil Sales from the Las Flores Pipeline System in June 2025."

116.    The May 2025 Press Release announced that the Company had begun oil production from the SYU Assets, stating that, "as of May 15, 2025 [Sable] has restarted production at the Santa Ynez Unit ('SYU') and has begun flowing oil production to Las Flores Canyon ('LFC')" and that "Sable has now completed its anomaly repair program on the Offshore Pipeline as specific by the Consent Decree."

117.    Moreover, the May 2025 Press Release touted the expected oil production from the SYU Assets. Specifically, the May 2025 Press Release stated, in relevant part, that "Sable expects to fill the ~540,000 barrels of crude oil storage capacity at LFC by the middle of June 2025 and subsequently recommence oil sales in July 2025."

118.    The May 2025 Press Release also quoted Defendant Flores as highlighting that the Company's oil production and collaboration with regulatory bodies, stating, in relevant part "[Sable Offshore] is proud to have safely and responsibly achieved first production at the Santa Ynez Unit" and is "very grateful for the cooperation and partnership from our local community and regulatory bodies as we seek to provide energy security to the State of California."

***May 20, 2025 Statement to the Los Angeles Times***

119.   On May 20, 2025, a spokesperson for the Company made the following statement regarding the various regulatory actions taken against the Company to the publication the Los Angeles Times: "It's our position the lawsuits are without merit and will not impact the project."[4]

### *May 22, 2025 Prospectus*

120.   On May 22, 2025, the Company filed a Form 424B5 with the SEC (the "2025 Prospectus") in connection with a secondary public offering ("SPO"). In the SPO, Sable offered 8,695,654 shares of common stock at $29.50 per share.

121.   The 2025 Prospectus represented that Sable had initiated oil production from the SYU Assets. Specifically, the 2025 Prospectus stated, in relevant part, that "[o]n May 15, 2025, Sable initiated oil production from six wells on Platform Harmony at SYU and began flowing oil production to Las Flores Canyon ("LFC") at an initial rate of approximately 6,000 barrels of oil per day." The 2025 Prospectus also provided investors with expectations on 2025 oil production from the SYU assets, stating that "Sable expects to initiate production from the additional 44 wells on Platform Heritage and the additional 26 wells on Platform Hondo in July 2025 and August 2025, respectively."

122.   Additionally, the 2025 Prospectus touted the purported repairs the Company made to the SYU assets, stating, in relevant part:

On May 18, 2025, Sable completed anomaly repairs on Line 324 (formerly known as Line 901), which extends from the Las Flores Station on the California cost to the Gaviota Pump Station in the Santa Barbara County, California, and Line 325 (formerly known as Line 903), which extends from the Gaviota Pump Station to Pentland Station in Kern County, California, the point of sale. ***With the completion of such repairs, Sable has now completed its anomaly repair program on the Onshore Pipeline as specified by a Consent Decree. . . .***

---

[4] Grace Toohey, *Offshore Oil Operation Near Santa Barbara Resumes Production After 10 Years*, LOS ANGELES TIMES (May 20, 2025, 11:25 AM), https://www.latimes.com/california/story/2025-05-20/offshore-oil-production-resumes-santa-barbara.

123.   The 2025 Prospectus also discussed the loan maturity date as oil production of the SYU Assets purportedly resumed, stating "[u]nder the terms of the Senior Secured Term Loan, the restart of production on May 15, 2025 is expected to trigger the springing maturity date resulting in the loans thereunder maturing on January 9, 2026."

### May 23, 2025 Statement to Courthouse News

124.   On May 23, 2025, the same spokesperson referenced and identified in ¶119, *supra*, made the following statement to the publication Courthouse News Service: "All the work Sable has performed is fully permitted and approved."[5]

125.   The statements in ¶¶115-124 were materially false and misleading at the time they were made because: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### **The Truth Begins to Emerge as the False and Misleading Statements Continue**

### May 28, 2025 Publication of Lieutenant Governor Letter

126.   The truth surrounding the Individual Defendants' false and misleading statements began to emerge on May 28, 2025 when the May 2025 Letter was published, in

---

[5] Sam Ribakoff, *One Decade After Disaster, Drilling Returns to Santa Barbara*, COURTHOUSE NEWS SERVICE (May 23, 2025), https://courthousenews.com/one-decade-after-disaster-drilling-returns-to-santa-barbara/.

which Eleni Kounalakis, the Lieutenant Governor of California and the Chair of the California State Lands Commission wrote a letter to Rusch concerning its recent public disclosures.

127.   Upon information and belief, the May 2025 Letter was not published on the internet for public viewing until May 28, 2025, five days after it was first sent to the Company. The May 2025 Letter stated, in relevant part:

I am writing to express my serious concerns regarding Sable Offshore Corp.'s [May 2025 Press Release] which you sent to Commission staff on the same day. *The press release appears to mischaracterize the nature of recent activities, causing significant public confusion and raising questions regarding Sable's intentions. Your press release also implies that Sable has restarted operations at the Santa Ynez Unit (SYU). However, Commission staff has informed me that the limited volume oil flows are the result of well-testing procedures required by the Bureau of Safety and Environmental Enforcement prior to restart.* These activities *do not constitute a resumption of commercial production* or a full restart of the SYU. Characterizing testing activities as a restart of operations *is not only misleading but also highly inappropriate – particularly given that Sable has not obtained the necessary regulatory approvals to fully resume operations at SYU*.

I am also concerned that as Exxon's designated operator, Sable was required to communicate with Commission staff before initiating any oil flow through the offshore pipeline, even in this limited capacity. *Sable's failure to clearly and timely communicate these activities to the Commission undermines trust of Sable's motives, demonstrates a lack of understanding of the significant concerns held by many regarding the resumption of activities*, and raises serious questions about Sable's willingness to be a transparent operator.

Commission staff's letter dated May 9, 2025, *made clear that failure to comply with applicable regulatory requirements or to resolve any outstanding regulatory issues could constitute a breach of the Commission's leases*. Any attempt to restart commercial operations at the SYU without final regulatory approvals *may place the company in violation of its lease terms and jeopardize the status of Sable's holdover lease*.

As Chair of the State Lands Commission, it is my expectation that Sable will resolve all pending legal challenges and litigation with other state agencies prior to the full restart of operations. *The willful disregard for the directives of regulatory agencies does not engender trust or confidence in Sable's willingness to serve as a responsible partner, and could weigh significantly into considerations on the future assignment of the SYU leases from Exxon to Sable*.

***May 28, 2025 Injunction and News Articles***

128.    The same day the May 2025 Letter was published, Judge Anderle issued a preliminary injunction in the CCC Action enjoining Sable from continuing its unpermitted maintenance and repair activities in the SYU Assets. In doing so, Judge Anderle held that the CCC made a prima facie showing that the Company had violated the California Coastal Act and the CCC's April 10 cease and desist order.

129.    The same day, KEYT, a news organization local to Santa Barbara, published an article titled "Santa Barbara County Judge issues preliminary injunction against Sable Offshore as the company announces completion of pipeline tests" (the "KEYT Article"). The KEYT Article stated the following with regard to the Company's assertion that it had restarted production in California:

Sable Offshore announced that it has completed all required hydrotesting of onshore pipelines necessary to transport oil across Santa Barbara County, ***but the Houston-based company suffered a setback regarding repair work on along the coast in court Wednesday***.

The announcement of pipeline work comes as representatives of Sable Offshore and the California Coastal Commission met Wednesday about the pending litigation between the two entities.

\* \* \*

Wednesday morning, Santa Barbara County ***Judge Thomas Anderle granted a preliminary injunction requested by the California Coastal Commission against Sable Offshore for alleged violations of The California Coastal Act***.

The injunction ***could impact Sable's ability to do future repairs or maintenance until its legal battle with the state regulator is settled***. Linda

Verified Shareholder Derivative Complaint

Krop with the Environmental Defense Center *questioned Sable's assertions that it has completed all necessary repairs in an interview Wednesday with Your News Channel.*

She shared that this is *the first time a judge has ruled that Sable Offshore is violating the law instead of state regulators and environmental groups.*

Krop, whose organization opposes restarting oil production and has been involved in multiple lawsuits related to the project, *says Sable's attorney told the judge that granting the injunction would harm the company*.

"If Sable really has completed all the repairs, they would be fine with this injunction," argued Krop. "The injunction only applies to repairs on the pipeline. So why does Sable care about this injunction if it's really completed the repairs?"

\* \* \*

A California Coastal Commission spokesperson sent a statement in response to Your News Channel's inquiries stating, "*Sable has consistently ignored California law, as confirmed by the court's decision today [Wednesday] to halt work on this aging oil pipeline in Santa Barbara. This fly-by-night oil company has repeatedly abused the public's trust, racking up millions of dollars in fines and causing environmental damage along the treasured Gaviota Coast.*"

130.   Also on May 28, 2025, the online publication Investing.com published an article titled "Sable Offshore Corp stock sinks following court injunction" (the "Investing.com Article"). The Investing.com Article stated the following:

Shares of Sable Offshore Corp (NYSE:SOC) tumbled 14% after the *California Coastal Commission was granted a preliminary injunction against the company's pipeline repair and maintenance activities within the coastal zone in unincorporated Santa Barbara County.* The court's decision, which aligns with the Coastal Act's *strict regulations on coastal development, has raised concerns about potential project delays and additional costs for Sable Offshore.*

*The legal proceedings stem from allegations that Sable Offshore Corp did not obtain the necessary coastal development permits (CDPs) for their ongoing repair and maintenance work on the Las Flores Pipelines.* Despite

Sable's claims that the work was authorized under existing permits from the County of Santa Barbara, ***the court found a prima facie case for the Coastal Commission, indicating that the activities constituted a violation of the Coastal Act.***

The injunction ***stops Sable from continuing any development*** associated with the return to service of the Las Flores Pipelines CA-324 and CA-325 unless they secure a new, operative CDP or other form of Coastal Act authorization. The company had resumed repair and maintenance activities earlier in February 2025, following confirmation from the County that the activities were authorized under existing permits.

The court's ruling highlights the ongoing tension between regulatory compliance and operational progress within the energy sector. Sable Offshore Corp's stock movement reflects investor concerns over the potential impact of regulatory hurdles on the company's ability to complete essential maintenance work and resume operations.

131.    On this news, the price per share of the Company's common stock fell $5.04, or approximately 15.3%, from a price per share of $32.93 at the close of trading on May 27, 2025 to close at $27.89 per share on May 28, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

132.    For example, on the same day, the Santa Barbara Independent published an article containing quotes from Rusch where he stated that the injunction in the CCC Action would not impact the Company's on the oil production from the SYU Assets. Specifically, Rusch was quoted as stating "Today's court ruling was about the maintenance and repair of the Las Flores Pipeline System. As of this morning, that work, including all hydrotesting of the lines, has been successfully completed." Rusch further added "We look forward to overturning today's decision, though it has no bearing on Sable's plans to recommence oil sales by July."

***May 28, 2025 Form 8-K***

133.    On May 28, 2025, the Company filed a Current Report on Form 8-K with the

SEC (the "May 2025 Form 8-K"). The May 2025 Form 8-K stated that the Company had completed all of the necessary repairs for the SYU Assets. Specifically, the May 2025 Form 8-K stated:

> On May 27, 2025 Sable Offshore Corp. conducted a successful hydrotest of the final segment of Line 325 and has now successfully hydrotested all segments of Line 324 and Line 325 (collectively, the "Onshore Pipeline"), satisfying the final operational condition to restart of the Onshore Pipeline as outlined in the Consent Decree. Therefore, no more repairs are required to the Onshore Pipelines prior to restart.

134.   The statements in ¶¶132-133 were materially false and misleading at the time it was made because it failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### June 3, 2025 Temporary Restraining Order

135.   The truth continued to emerge on June 3, 2025, when Judge Geck issued a TRO preventing OSFM from granting further authorizations to the Company and preventing Sable from restarting the use of the pipelines. In a sworn declaration to the court, Rusch stated that Sable is "required to meet specific deadlines in order to thereafter conduct operations at the Pipelines, which is critical to the livelihood of [Sable's]

business," and that ***"[i]f a TRO is issued, Plaintiffs will be forced to shut down repair and maintenance activities, which will require Plaintiffs to incur significant economic damages.***" Rusch further swore that as a result of the TRO, Sable would have to "to absorb costs amounting to approximately $423,100 per day, or approximately $2,500,000 per week" and "lay off approximately 75 workers."

136.   On this news, the price per share of the Company's common stock fell $5.14, or approximately 17.6%, from a price per share of $29.18 at the close of trading on June 2, 2025 to close at $24.04 per share on June 3, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

137.   For instance, also on June 3, 2025, Rusch stated to Noozehawk that "[t]he court decision does not impede Sable's preparations for restraining the flow of oil. Restart of the Las Flores Pipeline System is governed by a federal consent decree."

138.   The statement in ¶137 was materially false and misleading at the time it was made because it failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all

relevant times.

### October 15, 2025 CCC Action Ruling and Press Release

139.    On October 15, 2025, Judge Anderle ruled in favor of the CCC in the CCC Action, finding both that the Company's construction activity was not authorized and that the CCC had not abused its discretion. Judge Anderle further held that the Company's work was unauthorized and that the CCC had the authority to issue a cease and desist orders for the Company's violations of the California Coastal Act.

140.    On this news, the price per share of the Company's common stock fell $3.56, or approximately 20.1%, from a price per share of $17.69 at the close of trading on October 14, 2025 to close at $14.13 per share on October 15, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

141.    For example, on the same day the Company issued a press release titled "Sable offshore Corp. Statement of California Coastal Commission Litigation" (the "CCC Ruling Press Release"). The CCC Ruling Press Release stated:

> **[T]he ruling would have no impact on the resumption of petroleum transportation through the Las Flores Pipeline System**. Additionally, oil and gas production from the federal Santa Ynez Unit and the flow of petroleum from the Santa Ynez Unit to the Las Flores Canyon processing facilities or to a potential Offshore Storage & Treating Vessel ("OS&T") would be unaffected by rulings in the Coastal Commission litigation."

(emphasis in original).

142.    The CCC Ruling Press Release contained a quote from Defendant Flores, who assured investors that the ruling would not have an impact on the Company's strategy in resumed production of the SYU Assets. Specifically, Defendant Flores is quoted as stating, in relevant part: "Although the tentative ruling is disappointing, it has **no impact** on Sable's

business strategy of either resuming petroleum transportation through the Las Flores Pipeline System or selling its Santa Ynez Unit production through an OS&T." (emphasis in original).

143.    The statements in ¶¶141-142 was materially false and misleading at the time it was made because it failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

### *October 31, 2025 Hunterbrook Media Report*

144.    The truth continued to emerge on October 31, 2025, when Hunterbrook published the Hunterbrook Report. The Hunterbrook Report revealed that Defendant Flores "told a select group of investors in October that the company would likely have to raise up to $200 million in equity by the end of 2025." Notably, the Company had not publicly disclosed its pressing need for an increase in equity, which would also result in the dilution of existing share value. The Hunterbrook Report also contained a thirty-eight minute audio recording of a conversation between Defendant Flores and investors. On the recording, Defendant Flores stated that:

We're supposed to be on production in September, right? We're not gonna be

on production in September, so we're gonna have to bridge a little to the financing. We'll need some type of injection somewhere in the $100 to $150 to $200 million dollar range.

145.    On this news, the price per share of the Company's common stock fell $2.37, or roughly 18.5%, from a price per share of $12.83 at the close of trading on October 30, 2025 to close at $10.46 per share on October 31, 2025. However, the Individual Defendants continued to obfuscate the true nature of the Company's regulatory noncompliance and the impact of such noncompliance on its ability to restart oil production and its overall financial prospects.

146.    For instance, also on October 31, 2025, the Company disputed the allegations asserted in the Hunterbrook Report claiming that the audio recording was altered in some way. Specifically, the Company reported to Hunterbrook that "based upon information provided to us we believe the alleged recording was either AI generated or otherwise altered."

147.    The statements in ¶146 were materially false and misleading at the time they were made because they failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

# THE TRUTH FULLY EMERGES

### *November 3, 2025 Press Release*

148.    The truth fully emerged on November 3, 2025, when the Company issued the November 2025 Press Release. The November 2025 Press Release noted that the Company had entered into an amended loan agreement with Exxon, which would become effective subsequent to Sable's raising at least $225 million in equity contributions. The November 2025 Press Release further stated that the amended loan agreement extends the maturity date of the loan by one year (from March 31, 2026 to March 31, 2027) and increased the loan's annual interest rate from ten percent to fifteen percent.

149.    Additionally, the November 2025 Press Release reported that "the Company's Board of Directors formed a Special Committee of independent directors to undertake an independent investigation of the allegations contained in an October 31, 2025 report published by Hunterbrook, which contains audio recording of a call that took place in October 2025." Notably, the November 2025 Press Release also reported that the Company was no longer pursuing the use of pipelines as its primary mechanism for delivering oil and instead was pursuing an "Offshore Storage and Treating Vessel" strategy.

### *November 4, 2025 Santa Barbara County Supervisors Vote*

150.    The next day, on November 4, 2025, the Santa Barbara Board voted 4-1 to deny the transfer of the FDPs for the SYU Assets from Exxon to Sable. Notably, Lavagnino, who previously voted in favor of Sable but reversed his support, changed his mind due to the Company's lack of compliance with the law and avoidance of regulators. The Santa Maria Sun reported Lavagnino's comments, stating:

> "[T]he landscape has changed dramatically since February," he said during the hearing. "To me, the following are facts, not emotions: Since February, Sable has been charged criminally 21 times, with five of those charges being felonies."

> He clarified that although September's charges from the Santa Barbara

County District Attorney's Office have not been adjudicated, "they are still part of the evidence" that puts Sable's ability to comply with county standards while operating the Santa Ynez Unit into question.

Among the 21 criminal counts, the five felony violations are centered on three waterways—Asphaltum Creek, Nojoqui Creek, and Arroyo Quemado—which the county District Attorney accused Sable of knowingly polluting during excavation and repair work tied to its Santa Ynez Unit efforts.

"I have many friends in the oil industry, and I will continue to support efforts to access our natural resources, but it has to be done responsibly by operators who put safety above profits," Lavagnino said. "***The evidence in this case is overwhelming. There is something wrong with the strategy of Sable's leadership. Trying to simply bulldoze through the permitting process has not been helpful and is not the way we expect businesses in Santa Barbara County to conduct themselves.***"

151.   On this news, the price per share of the Company's common stock fell $3.19, or roughly 30.5%, from a price per share of $10.46 at the close of trading on October 31, 2025 to close at $7.27 on November 3, 2025. As the market continued to adjust to the Company's revelations, the price per share of the Company's common stock fell a further $1.37, or roughly 18.8%, from a price per share of $7.27 at the close of trading on November 3, 2025 to close at $5.90 on November 4, 2025.

## SUBSEQUENT DEVELOPMENTS

152.   After the Relevant Period, on November 10, 2025, the Company issued a press release announcing that the Company entered into subscription agreements to issue 45,454,546 shares of its common stock in a private placement to institutional investors at a purchase price of $5.50 per share (the "November Subscription Agreement Press Release"). The November Subscription Agreement Press Release also stated that the Company "expects to receive gross proceeds of approximately $250 million, before deducting placement agent fees and other offering expenses."

153.   On December 1, 2025, the Company issued a Current Report on Form 8-K notifying investors of intention to shift regulatory oversight from California to the federal

government (the "December 2025 Form 8-K"). Specifically, the December 2025 Form 8-K stated, in relevant part:

> On November 26, 2025, Sable Offshore Corp. (the "Company") notified the Pipeline and Hazardous Materials Safety Administration ("PHMSA") of its determination that the Company's pipeline connecting the Santa Ynez Unit to the Pentland Station terminal in Kern County, CA constitutes an interstate pipeline facility under the Pipeline Safety Act. The Company requested PHMSA concurrence with the Company's determination, as well as guidance on the orderly transition of regulatory oversight from the California Office of the State Fire Marshal to PHMSA.

> The Company continues to pursue an offshore storage and treating vessel strategy to provide access to domestic and global markets via shuttle tankers for federal crude oil produced from the Santa Ynez Unit. Concurrently, the Company continues to work diligently to safely and responsibly resume petroleum transportation through its onshore pipeline facilities as part of its publicized dual option offtake strategy.

## **DAMAGES TO SABLE**

154.    As a direct and proximate result of the Individual Defendants' conduct, Sable has lost and will continue to lose and expend many millions of dollars.

155.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

156.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the Oil Production Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

157. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any

investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including the actions discussed herein taken by the CCC, the Center for Biological Diversity, the Santa Barbara District Attorney, and the CRWQCB.

158.   Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

159.   As a direct and proximate result of the Individual Defendants' conduct, Sable has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

160.   Plaintiff brings this action derivatively and for the benefit of Sable to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Sable, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

161.   Sable is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162.   Plaintiff is, and has been at all relevant times, a shareholder of Sable. Plaintiff will adequately and fairly represent the interests of Sable in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

163.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

164.   A pre-suit demand on the Board is futile and, therefore, excused. When this

action was filed, Sable's Board consisted of the following four individuals: Defendants Flores, Dillard, Pipkin, and Sarofim (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to two of the four Director-Defendants that were on the Board at the time this action was filed.

165.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the Oil Production Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

166.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Sable to engage in the Oil Production Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused Sable to issue false and misleading statements which were intended to make Sable appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

167.   Additional reasons that demand on Defendant Flores is futile follow. Defendant Flores has served as Chairman of the Board and as CEO of the Company since February 2024. The Company provides Defendant Flores with his principal occupation for which he receives handsome compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Oil Production Misconduct and to make and/or cause the Company to make false and misleading statements,

consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Flores is a defendant in the Securities Class Action. For these reasons, too, Defendant Flores breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Dillard is futile follow. Defendant Dillard has served as a Company director since February 2024. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. In addition, Defendant Dillard receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Oil Production Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Dillard breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Pipkin is futile follow. Defendant Pipkin has served as a Company director since February 2024. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. In addition, Defendant Pipkin receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Oil Production Misconduct and to make and/or cause the Company to make

false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Pipkin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Sarofim is futile follow. Defendant Sarofim has served as a Company director since February 2024. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. In addition, Defendant Sarofim receives handsome compensation from the Company for his role as a director. As a trusted director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Oil Production Misconduct and to make and/or cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sarofim breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171. Additional reasons that demand on the Board is futile follow.

172. Defendants Sarofim (as Chair), Dillard, and Pipkin served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and

risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

173.   In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Oil Production Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

174.   Sable has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Sable any part of the damages Sable suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

175.   The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and

disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176.   The acts complained of herein constitute violations of fiduciary duties owed by Sable's officers and directors, and these acts are incapable of ratification.

177.   The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Sable. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Sable, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

178.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Sable to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least two of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**
### **Against the Individual Defendants for Breach of Fiduciary Duties**

53

Verified Shareholder Derivative Complaint

180.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

181.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Sable's business and affairs.

182.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Sable.

184.    In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Oil Production Misconduct.

185.    Also in breach of their fiduciary duties owed to Sable, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company engaged in the Oil Production Misconduct; (2) as a result of the Oil Production Misconduct, the Company did not restart oil production off the Coast of California; (3) the lawsuits and regulatory actions against the Company pertaining to the Oil Production Misconduct were based in merit and thus posed significant obstacles to the resumption of oil production; (4) given the meritorious nature of the lawsuits and regulatory actions against the Company, the Company was not cooperating with regulatory bodies; (5) as a result of the Oil Production Misconduct, the Company would be unable to meet the production figures and initial date of sales asserted in its 2025 Prospectus; and (6) there was an increased likelihood that Sable will have to raise additional capital as a result of the delays in production stemming from the Oil Production Misconduct. As a result of the foregoing, the Company's public statements were materially false and misleading

and/or lacked a reasonable basis at all relevant times.

186.   In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

187.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

188.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sable's securities.

189.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Sable's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent it from continuing to occur.

190.   These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

191.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Sable has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

192.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

193.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Sable.

195.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Sable that was tied to the performance or artificially inflated valuation of Sable, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

196.   Plaintiff, as a shareholder and a representative of Sable, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

197.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## THIRD CLAIM
### Against the Individual Defendants for Abuse of Control

Verified Shareholder Derivative Complaint

198.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Sable, for which they are legally responsible.

200.   As a direct and proximate result of the Individual Defendants' abuse of control, Sable has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

201.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## FOURTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

202.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Sable in a manner consistent with the operations of a publicly held corporation.

204.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Sable has sustained and will continue to sustain significant damages.

205.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

206.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## FIFTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

207.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208.   The Individual Defendants caused the Company to pay the Individual

Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

209.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Sable to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

210.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

211.   Plaintiff, on behalf of Sable, has no adequate remedy at law.

## SIXTH CLAIM
**Against Defendants Flores and Patrinely for Contribution Under Sections 10(b) and 21D of the Exchange Act**

212.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.   Sable and Defendants Flores and Patrinely are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Flores' and Defendant Patrinely willful and/or reckless violations of their obligations as officers and/or directors of the Company.

214.   Defendants Flores and Patrinely because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

215.   Accordingly, Defendants Flores and Patrinely are liable under 15 U.S.C. §

78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

216. As such, Sable is entitled to receive all appropriate contribution or indemnification from Defendants Flores and Patrinely.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Sable, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Sable;

(c)    Determining and awarding to Sable the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Sable and the Individual Defendants to take all necessary actions to reform and improve Sable's corporate governance and internal procedures to comply with applicable laws and to protect Sable and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Sable to nominate at least two candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Sable restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 17, 2025                Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest_____
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Email: RMoest@gmail.com

*Counsel for Plaintiff*

Docusign Envelope ID: 53D5E2E6-95A3-42A8-9C17-759098706AD9

## <u>VERIFICATION</u>

I, Udit Vora, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 16th day of December, 2025.

Signed by:

E179CA0138E34E0...

Udit Vora